1

2

3

4

5

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   TIMBISHA SHOSHONE TRIBE, EDWARD          CASE NO. CV F 09-1248 LJO SMS
     BEAMAN, VIRGINIA BECK, and
12   CLEAVELAND LYLE CASEY,

13                          Plaintiffs,      **ORDER ON PLAINTIFFS' PRELIMINARY**
                                             **INJUNCTION MOTION**
14
         vs.
15
     JOSEPH KENNEDY, MADELINE
16   ESTEVES, PAULINE ESTEVES, ANGELA
     BOLAND, and ERICK MASON,
17
                          Defendants.
18   _____/

19                              **INTRODUCTION**

20        Plaintiffs Timbisha Shoshone Tribe ("Tribe"),[1] Edward Beaman ("Mr. Beaman"), Virginia Beck

21   ("Ms. Beck"), and Cleaveland Lyle Casey ("Mr. Casey") ("collectively "Plaintiffs") move for a

22   preliminary injunction, pursuant to Fed. R. Civ. P. 65, against defendants Joseph Kennedy ("Mr.

23   Kennedy"), Madeline Esteves ("Ms. Esteves"), Pauline Esteves, Angela Boland ("Ms. Bond"), and Erick

24   Mason ("Mr. Mason") (collectively "Defendants").  For the following reasons, this Court DENIES

25   Plaintiffs' motion for preliminary injunction.

26   _____

27        [1]The status of the Tribe, its members, and its Tribal Council are in dispute, as explained *infra*.  Accordingly, the
     Tribe's identity as a "plaintiff" is based on the complaint filed in this action and shall not be construed as this Court's
28   expression of any view on the status of the Tribal Council or whether the Tribe authorized this action to be filed in its name.

                                              1

1 <u>**BACKGROUND**</u>

2 From 2006 through the present, Plaintiffs, Defendants, and others not party to this action have

3 contested the governance of the Tribe fiercely.  Governance of the Tribe has split, and two factions have

4 emerged–one faction based out of Bishop, California ("Bishop faction") and one faction based out of

5 Death Valley, California ("Death Valley faction").  Plaintiffs are associated with the Bishop faction,

6 Defendants are associated with the Death Valley faction.  In an attempt to gain leadership and control

7 over the tribe, funded by dueling Casino prospecting businesses, and separated by geography, the Bishop

8 and Death Valley factions have held separate elections and run parallel and competing tribal

9 governments since 2006.  All disputed elections have been appealed to the United States Department

10 of the Interior, Bureau of Indian Affairs ("BIA").  Currently, those appeals are consolidated and remain

11 unresolved.  Each faction claiming to be authorized representatives of the Tribe, bank accounts are

12 opened in the Tribe's name only to be closed or frozen once the bank becomes aware of the governance

13 dispute.  Adding to the confusion, the Death Valley faction, after re-examining enrollment records, dis-

14 enrolled over 70 people from the Tribe, including Plaintiffs and a large number of the Bishop faction.

15 These actions have caused harm to the parties, the Tribe, non-party Tribe members, former Tribe

16 members, government agencies and their agents, and businesses in the area surrounding tribal lands.

17 Below, the Court presents a brief synopsis of this dispute.

18 **Conflicting Tribal Elections and BIA Decisions**

19 The last undisputed Tribal Council election occurred in November 2006.  The results of that

20 election resulted in the following "2006 Council": defendant Mr. Kennedy was elected as Chairperson,

21 plaintiff Mr. Beaman elected as Vice-Chairperson, defendant Ms. Casey elected as Secretary/Treasurer,

22 and plaintiffs Mr. Casey and Ms. Beck elected as Executive Council members.  Under the laws of the

23 Tribe, the Tribal Council constitutes the government leadership of the Tribe.

24 **Factions Split**

25 The current dispute[2] began at an August 25, 2007 Tribal Council meeting.  Prior to the meeting,

26 two members of the Tribe's General Council, including Wallace Eddy, Sr. ("Mr. Eddy"), lodged charges

27

28 [2]A prior dispute in tribal leadership between 2002-2004 was resolved through arbitration. Kennedy Declaration, ¶3.

2

against Ms. Beck and Mr. Beaman, and called for their removal from the Tribal Council.  At the August

2007 meeting, Mr. Eddy presented the charges, but offered no evidence in support of the allegations.

A disagreement ensued over whether Ms. Beck and Mr. Beaman would be allowed to vote on the

removal charges.  The disagreement ended when Ms. Beck and Mr. Beaman walked out of the meeting.

Mr. Casey also left the meeting.  Mr. Kennedy declared that leaving the meeting constituted guilt of the

charges made, pursuant to Tribal custom.  A member of the General Council moved to remove Ms. Beck

and Mr. Beaman from the Tribal Council.  No vote was taken on this motion.  Mr. Kennedy "replaced"

Ms. Beck with another member with Margaret Armitage ("Ms. Armitage") to continue the meeting,

without following the procedures as outlined in the Tribe's Constitution.  As a result of the charges and

break-down at the meeting, the two competing factions formed–the Bishop faction led by Ms. Beck and

Mr. Beaman, and the Death Valley faction led by Mr. Kennedy.

**Bishop faction Special Tribal Council Meeting**

Mr. Beaman, Ms. Beck, and Mr. Casey, as the "governing majority" of the 2006 Council, called

a special Tribal Council meeting on September 22, 2007.  At that meeting, the three voted to: (1) declare

the removal of Ms. Beck and Mr. Beaman void; (2) affirm that the Tribal Council consisted of the 2006

Council members; (3) declare any efforts by Mr. Kennedy and Ms. Esteves to hold an election for Ms.

Beck's and Mr. Beaman's offices null and void; and (4) amend a  Tribal election ordinance and appoint

an election board in anctipation of the 2007 Tribal Council elections.  Tribal Council elections are held

each November.

**Competing 2007 Elections**

Mr. Kennedy called a meeting of the General Council on November 13, 2007 to conduct an

election for four positions of the Tribal Council, to replace Mr. Beaman, Ms. Beck, Mr. Casey, and Ms.

Esteves.  As a result of that election, the following "2007 Death Valley Tribal Council" was named: Mr.

Kennedy as Chairperson; Margaret Armitage as Vice-Chairperson; Madeline Esteves as Secretary-

Treasurer; Margaret Cortez and Pauline Esteves as Executive Council members.  Plaintiffs contend that

election was in violation of the Tribal Constitution.

On the same day, Mr. Beaman, Ms. Beck, and Mr. Casey held a separate Tribal Council election.

That election resulted in following "2007 Bishop Tribal Council": Doug Gholson ("Mr. Gholson") as

Chairperson; Mr. Beaman as Vice-Chairperson, Ms. Casey as Secretary/Treasurer Mr. Casey and Ms. Beck as Executive Council members. At this election, the election board appointed at the Bishop faction special meeting declared the results of the 2007 Death Valley Council election to be null and void. Defendants dispute the results of this election.

**Appeal of 2007 Elections**

Both the 2007 Death Valley Council and the 2007 Bishop Council sought recognition of their elections from the BIA. On December 14, 2007, Troy Burdick ("Sup. Burdick"), the Superintendent of the Central California Agency of the BIA concluded that both of the November 2007 elections were invalid, as they were conducted in violation of tribal law. RJN, Ex. 1. In addition, Sup. Burdick concluded that Mr. Kennedy's removal of Ms. Beck and Mr. Beaman at the August 2007 was inconsistent with tribal law. *Id*. Accordingly, Sup. Burdick continued to recognize the 2006 Council for government-to-government purposes. *Id*. Mr. Kennedy appealed that decision.

**Death Valley January 2008 Special Meeting and Subsequent BIA Action**

Mr. Kennedy organized and conducted a special General Council meeting on January 20, 2008. At that meeting, the body voted to ratify: (1) the results of the 2007 Death Valley Tribal Council election; (2) the results of the removals of Ms. Beck and Mr. Beaman at the August 2007 meeting; and (3) a legal interpretation that pursuant to tribal custom, Ms. Beck and Mr. Beaman's departure from the August 2007 meeting constituted admissions of the charges and resignations from the Tribal Council.

With the appeal of the December 14, 2007 decision pending, Sup. Burdick rescinded his December 14, 2007 decision and recognized the results of the Death Valley January 20, 2008 special meeting. Plaintiffs appealed that decision.

**Removal of Kennedy, Special Election, and BIA Action**

While the BIA appeals were pending, a petition signed by ten tribal members authorized a September 20, 2008 General Council meeting. The September 20, 2008 meeting was held in Las Vegas. Allegedly, Tribe members, their family and friends were treated to an all-expense paid vacation to Las Vegas for the meeting and were paid for each vote sponsored by a casino developer. It is further alleged that although General Council membership is restricted to Tribe members who are 16 years of age and older, children younger than 2 years old were paid for their vote in this election.

4

1    At that meeting, the General Council voted to remove Mr. Kennedy from his position as

2    Chairperson. Also at that meeting, the General Council accepted the resignation of Margaret Armitage

3    from the Tribal Council and voted to elect the following as the "2008 Gholson Tribal Council": Mr.

4    Gholson as Chairperson; Mr. Eddy as Vice-Chairperson; Ms. Esteves as Secretary-Treasurer, and

5    Margaret Cortez and Pauline Esteves as Executive Council members.  A month later, on October 17,

6    2008, Sup. Burdick issued a letter recognizing the 2008 Gholson Tribal Council for government-to-

7    government purposes. RJN, Ex. 5.

8                    **Further BIA Decisions and District Court Actions**

9    In the space of a month, Sup. Burdick issued three BIA decisions, each recognizing a different

10   Tribal Council.  Sup. Burdick's October 20, 2008 letter confirmed his prior decision to recognize the

11   2008 Gholson Tribal Council.  RJN, Ex. 6.  The next day, on October 21, 2008, Sup. Burdick issued a

12   letter to clarify that prior decisions were not final or effective because of the pending appeals and,

13   therefore, Sup. Burdick recognized the 2007 Death Valley Tribal Council for government-to-government

14   purposes.  One month later, on November 21, 2008, Sup. Burdick issued a letter that re-clarified that

15   since all pending appeals were not yet final, he recognized the 2006 Council as the tribal council for

16   government-to-government purposes.  Mr. Kennedy appealed each of those letters.

17   Less than two weeks later, in a December 4, 2008 letter, the BIA again reversed course to

18   recognize the 2008 Gholson Tribal Council, stating that "exigent circumstances" required reinstatement

19   of Sup. Burdick's October 17, 2008 decision. RJN, Ex. 9.  In response to the December 4, 2008 decision,

20   Mr. Kennedy and Ms. Esteves initiated an action against the BIA and various officials in the United

21   States District Court, Eastern District of California, Sacramento Division, styled *Timbisha Shoshone*

22   *Tribe v. Kempthorne* ("*Kempthorne* action"), Case No. 2:08-CV-0360 MCE DAD. RJN, Ex. 24-25 (filed

23   December 17, 2008).  In the *Kempthorne* action, Mr. Kennedy and Ms. Esteves sought injunctive and

24   declaratory relief to overturn the December 4, 2008 BIA decision.  On December 22, 2008, BIA

25   Regional Director Morris issued a letter to rescind the December 4, 2008 decision.  Thereafter, Mr.

26   Kennedy and Ms. Esteves requested dismissal of the *Kempthorne* action.

27   On February 17, 2009, Regional Director Morris issued a letter decision to reverse Sup.

28   Burdick's February 29, 2008 decision.  Regional Director Morris found, among other things, that the

1   actions at the August 2007 meeting to remove Ms. Beck and Mr. Beaman violated tribal law.  Unable

2   to establish that any subsequent tribal councils were formed properly, the February 17, 2009 decision

3   concluded that it would recognize the last undisputed tribal council for government-to-government

4   purposes; namely, the 2006 Council.  Defendants appealed that decision to the Interior Board of Indian

5   Appeals ("IBIA"). RJN, Ex. 12-14.[3]

6        On March 24, 2009, Regional Director Morris issued a second letter decision to reverse Sup.

7   Burdick's October 17, 2008 decision and concluded that the removal of Mr. Kennedy was improper.

8   Without a properly constituted Tribal Council, Regional Director Morris again concluded that the BIA

9   would recognize the 2006 Council.  Mr. Gholson, Mr. Eddy, and Ms. Cortez appealed that decision.

10        On June 22, 2009, Larry Echohawk, Assistant Secretary-Indian Affairs, issued a letter to

11  consolidate the appeals from Regional Director Morris' February and March 2009 decision.  The

12  consolidated appeals are pending. RJN, Ex. 18, 19.

13                    **Removal of Tribe Property from Death Valley Office**

14        According to the declarations of Tameka Vazquez and Roberta Hunter, among others, Mr.

15  Gholson removed Tribe property from the Death Valley office on two occasions.  On October 20, 2008,

16  Mr. Gholson removed computers containing the Tribe's fiscal files and records, computer equipment

17  and furniture.  On December 12, 2008, Mr. Gholson removed the Tribe's finance computers, paper and

18  electronic files, and computer software. Mr. Gholson moved the computers and files from the Death

19  Valley office to an office he established in Bishop, California.

20              **November 2008 Election Disenrollment of Plaintiffs and other Bishop members**

21        Prior to the November 2008 election, the Death Valley faction Tribal Election Committee asked

22  the Death Valley faction Enrollment Committee to conduct a full review of tribal membership "to ensure

23  that voting be limited to those eligible for membership under the Constitutional criteria." Goad Decl.

24  17.  According to Grace Goad, a member of the Enrollment Committee, this review "is supposed to be

25  done at every election, and is normal practice." *Id*.  In conducting a genealogy review, the Enrollment

26

27        [3]A second action was initiated in the United States District Court for the Eastern District of California, Sacramento Division.  In this action, plaintiffs sought to compel the BIA to issue a decision on the pending appeals.  Because the BIA indicated that it would issue its decision, that case was dismissed as moot.

28

1    Committee determined that certain individuals were enrolled in the Tribe erroneously.

2         The Death Valley Enrollment Committee reported on September 22, 2008 that Mr. Gholson and

3    Mr. Casey were ineligible to run for office because they did not meet the Constitutional requirements

4    for Tribe membership.  That is, the Death Valley Enrollment Committee determined that Mr. Gholson,

5    Mr. Casey, and Ms. Beck, among others, were "improperly enrolled individuals" who do not qualify for

6    membership in the Tribe.  In all, the Enrollment Committee found that 74 individuals had been

7    improperly enrolled in the Tribe, and consequently ineligible to vote in the November 2008 election.

8         The results of the Death Valley November 2008 election yielded a "2008 Death Valley Tribal

9    Council," made up of the following members: Mr. Kennedy as Chairperson; Pauline Esteves as Vice-

10   Chairperson; Ms. Esteves as Secretary-Treasurer, and Angela Boland and Erick Mason as Executive

11   Committee members.

12        After notices were sent, the 2008 Death Valley Tribal Council accepted the recommendation of

13   its Enrollment Committee and determined that 73 members should be removed from the Tribal roll.

14   Thereafter, on December 27, 2008, the 2008 Death Valley Tribal Council disenrolled Mr. Gholson, Mr.

15   Beaman, Mr. Casey, and Ms. Beck, among others, from the Tribe.  Mr. Gholson, Mr. Bean, Mr. Casey,

16   and Ms. Beck do not recognize this disenrollment, which they call "fraudulent" and "illegal."

17                            **Frozen/Closed Bank Accounts**

18        At least seven bank accounts have been opened then subsequently frozen or closed because of

19   the dispute between the Death Valley and Bishop factions.  These accounts were opened to deposit

20   funding from various sources, including: (1) contracts with the BIA entered into pursuant to the Indian

21   Self-Determination and Educational Assistance Act ("638 funding"); (2) income from the RSTF which

22   is a fund established by the State of California pursuant to the terms of Tribal-State Compacts entered

23   into by the State with various gaming tribes in California; (3) 638 funding for Tribal welfare programs;

24   (4) 638 funding for Tribal educational programs; and (5) 638 funding for Tribal housing programs. The

25   factional war fought at numerous banks has caused harmed to the Tribe, and its members, the

26   government, and businesspeople in a number of ways.  For example, the bank account activities have

27   prevented Tribe members from receiving federal and state benefits payments, causing some members

28   to go into arrears with bill payments and causing others to lose their homes in foreclosure.  Some Tribe

members cannot buy food.  In addition, the Tribe has lost grants from the Environmental Protection Agency for failure to account for grant funds, and the Internal Revenue Service has levied fines against the Tribe for failure to pay taxes.  The dispute has also halted environmental clean-up and research efforts by the United States Department of Energy.  Tribe members, the government and its agents, and businesspeople in the areas surrounding the Tribe declare that Tribe checks are rejected repeatedly for insufficient funds or inability to release funds.  One person has reported the failure to pay to a law enforcement agency, where an investigation is on-going.  Below is a synopsis of bank account activities.

In September 2007, Ms. Beck attempted to remove funds from the Tribe's general account at the Community Bank of the Sierra. Kennedy Decl. 10.  After contact with Defendants and/or their legal counsel, the bank froze the account.

On September 26, 2007, a business account was opened with Wells Fargo Bank, N.A. ("Wells Fargo") in the Tribe's name.  According to Wells Fargo, the authorized signers on the Account were Douglas J. Rollins and Mr. Beaman.  RJN, Ex. 22, p. 3.  According to Wells Fargo, Mr. Kennedy contacted the bank in writing to explain that Mr. Beaman was no longer a member of the Tribe's Council and demanded that Wells Fargo freeze the account and deny Mr. Beaman and Ms. Beck access.  After negotiations, on November 30, 2007, Wells Fargo initiated an interpleader action against the Tribe, Mr. Kennedy, Mr. Beaman, and Douglass J. Rollins in the Sacramento Superior Court.  Wells Fargo initiated the action "in response to the...dispute" between the parties and froze the account on October 15, 2007. The interpleader action in unresolved. RJN, 23.

In December 2008, Mr. Gholson advised Union Bank of California ("Union Bank") to freeze or close the Tribe's accounts until new signatories could be added.  Declaration of Roberta Hunter ("Hunter Decl.") ¶11; Hunter Decl., Ex. C.  The Union Bank account held the Tribe's General Fund, and included EPA, THPO, and HUD funds. Hunter Decl. ¶11.  Faced with conflicting demands by Mr. Gholson and Mr. Kennedy, and aware of the ongoing appeals and disputed tribal elections, Union Bank wrote a January 21, 2009 letter indicating that it intended to file an interpleader action and deposit the disputed funds with a court.  Hunter Decl. Ex. C.

The Death Valley faction opened new accounts on January 7, 2009 with Wells Fargo in Pahrump, Nevada.  In February 2009, the account was frozen after the Bishop faction notified the bank of the

dispute in Tribal leadership. As a result, "[c]hecks were returned to vendors, payments for utilities were rejected, and each account had a balance of funds remaining." Hunter Decl. ¶12.

The Death Valley faction opened more new accounts in March 2009 with Bay Bank. Hunter Decl. ¶13. The account held RSTF funds, among other funds. *Id*. On May 21, 2009, Bay Bank indicated that it was aware of the "ongoing dispute for Tribal leadership" and that the bank had "been threatened with litigation proceedings in the State of California." Hunter Decl. Ex. D. Because Bay Bank did "not want to incur charges related to such a lawsuit," the bank closed the accounts on May 26, 2009. *Id*.

A September 2009 "Timbisha Shoshone Newsletter," ostensibly published by plaintiffs and the Bishop faction, acknowledges the actions of the Bishop faction in freezing bank accounts opened by the Death Valley faction. On the front page of the newsletter, in an article titled, "What's Next," the unnamed author acknowledges that a children's trust fund controlled by the Death Valley Office "was frozen to protect the children's funds during this dispute." The article explains that the "bank will allow deposits to be made, just not allowing [sic] any withdrawals." Hunter Decl. Ex. E. On the bottom of page 2, an "FYI" section reads, in full: "The Bishop Office is aware that the RSTF checks are drawn from Canyon National Bank, but we are not freezing the account so everyone can get their check cashed. We are not here to hurt Tribal Members. We just want to stop the illegal distribution." *Id*. The "illegal distribution" is explained in the aforementioned "What's Next" article, which explains that the "Death Valley office went against the General Council's vote of a 100% distribution of RSTF funds by not disbursing the checks beyond the falsely 'dis-enrolled' members, but also Tribal Members and who are on Committees and work for the Bishop office." *Id*. In a "Letter from Margret Cortez," on page 3 of the newsletter, Ms. Cortez also bemoans the disenrollment. Ms. Cortez ends her letter with the following passage, "Oh yeah and you know how Joe (Kennedy) is always saying that George (Gholson) is freezing all the accounts, well he does but not until after a couple of weeks from when people start getting their checks, so the people can have their money." *Id*. The newsletter ends with a list of "fraudulently disenrolled members" and urges those who are disenrolled to vote in the next Bishop election.

Despite the newsletter's statement that the Bishop faction would not seek to freeze the Canyon National Bank account, the Canyon National Bank account was frozen on September 30, 2009 at the insistence of the Bishop faction. Hunter Decl., ¶14.

**Instant Action**

Plaintiffs, Bishop faction members of the 2006 Council, initiated this action against Defendants, the 2008 Death Valley Tribal Council, on May 20, 2009 in the Superior Court of California, County of Inyo. Mr. Kennedy removed the action to this Court on July 15, 2009.

Plaintiffs accuse Defendants of forming an "illegal" Tribal Council as part of a "conspiracy to violate the Constitution and the laws of the Tribe by continuing to divert" tribal funds "to bank accounts maintained with various banks." Compl. 2. Plaintiffs assert that Defendants "[m]aintenence and use of these bank accounts is unlawful under the Constitution and laws of the Tribe in that the properly constituted Tribal Council of the Tribe is the only governing authority authorized to expend funding on behalf of the Tribe." *Id*. In their complaint for injunctive, declaratory, and other relief, Plaintiffs assert the following causes of action against Defendants: (1) violation of tribal law; (2) conversion; (3) fraud; (4) breach of fiduciary duty; (5) abuse of process; (6) constructive trust; (7) wrongful interference with prospective economic advantage; (8) unfair competition; (9) accounting; and (10) declaratory relief.

Plaintiffs moved for preliminary injunction on September 14, 2009. Plaintiffs seek a preliminary injunction with the following terms:

(1) Defendants are required to abide by the results of any majority vote taken by the Tribal Council which complies with the Tribe's Constitution, and must be comprised of any three (3) of the following individuals: Joseph Kennedy, Madeline Esteves, Virginia Beck, Edward Beaman, and Cleveland Lyle Casey;

(2) Defendants are prohibited from making any expenditure of any Tribal funding without a majority vote taken by the Tribal Council which complies with the Tribe's Constitution, and must be comprised of any three (3) of the following individuals: Joseph Kennedy, Madeline Esteves, Virginia Beck, Edward Beaman, and Cleveland Lyle Casey;

(3) Defendants are prohibited from forming any competing Tribal Council, or other Tribal governmental body, other than the one comprised exclusively of the following individuals: Joseph Kennedy, Madeline Esteves, Virginia Beck, Edward Beaman, and Cleveland Lyle Casey;

(4) Defendants are prohibited from making any representations to any person concerning the governing authority of the Tribe absent a majority vote taken by the Tribal Council which complies with the Tribe's Constitution, and must be comprised of any three (3) of the following individuals: Joseph Kennedy, Madeline Esteves, Virginia Beck, Edward Beaman, and Cleveland Lyle Casey; and

(5) Defendants are prohibited from aiding, abetting or encouraging any other persons or entity to do any of the aforementioned acts.

10

1  Defendants opposed the motion on October 7, 2009.  Plaintiffs replied on October 13, 2009.  With no

2  party requesting a hearing, this Court determined that this motion was suitable for a decision without

3  a hearing, vacated the hearing on this motion, pursuant to Local Rule 78-230(h), and issues the following

4  order.

## PRELIMINARY INJUNCTION MOTION

### Standard of Review

7      A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 128 S. Ct.

8  2207, 2219 (2008).  As such, the Court may only grant such relief "upon a clear showing that the

9  plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Def. Council, Inc.*, 129 S.Ct. 365, 375 (2008).

10  To prevail, the moving party must show : (1) a likelihood of success on the merits; (2) a likelihood that

11  the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of

12  equities tips in the moving party's favor; and (4) than an injunction is in the public interest. *Id*. at 374.

13  In considering the four factors, the Court "must balance the competing claims of injury and must

14  consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129

15  S.Ct. at 376 (quoting *Amoco Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531 542 (1987)); *Indep. Living

16  Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).

### Likelihood of Success on Merits

18      Pursuant to *Winter*, Plaintiffs must make a "clear showing" that they are "likely to succeed on

19  the merits." 129 S.Ct. at 375-76; *Stormans Inc. v. Selecky*, 571 F.3d 960, 978 (9th Cir. 2009).[4]

20      Plaintiffs assert ten causes of action against Defendants: (1) violation of tribal law; (2)

21  conversion; (3) fraud; (4) breach of fiduciary duty; (5) abuse of process; (6) constructive trust; (7)

22  wrongful interference with prospective economic advantage; (8) unfair competition; (9) accounting; and

23  (10) declaratory relief.   Plaintiffs, however, do not address the elements of the causes of action they

---

25  [4]Plaintiffs erroneously argue that this Court may apply a lesser standard than that set forth in *Winter v. Nat'l Res.
26  Def. Council, Inc*., 129 S.Ct. 365, 375 (2008).  In considering preliminary injunctions after *Winter*, Ninth Circuit cases have
unanimously rejected this notion.  *See e.g., Am. Trucking Ass'ns. Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.
2009) ("To the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable.");
27  *Stormans Inc. v. Selecky*, 571 F.3d 960, 977 (9th Cir. 2009) (recognizing that the *Winter* court rejected the Ninth Circuit
sliding scale test because it was "too lenient"); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847-849-50 (9th Cir. 2009)
28  (applying *Winter* factors rather than former sliding scale test).

assert against Defendants in their complaint.  Rather, Plaintiffs set forth a broad stroke argument that they are likely to prevail on all of their causes of action because they constitute the governing majority of the Tribal Council under BIA decisions and tribal law.  Thus, Plaintiffs' challenge rests entirely on their position that Plaintiffs, as the "governing majority of the 2006 Council" are the "rightful" Tribal Council whereas Defendants are acting outside of tribal law and BIA decisions to form an "illegal government" that is preventing "Plaintiffs' from participating as they are legally entitled to do."  To support their position, Plaintiffs rely on the BIA decisions explained above and tribal law.  Plaintiffs conclude that they are entitled to interim injunctive relief pending the administrative proceedings.

Defendants argue that Plaintiffs are unlikely to succeed on the merits of their claims for three reasons.  First, Defendants contend that this Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs lack standing to assert their claims and Defendants possess sovereign immunity from suit.  Second, Defendants point out that the BIA's record of decisions are inconclusive as to what party is the rightful Tribal Council.  Third, Defendants explain that tribal law does not support Plaintiffs' position that they are the "rightful" Tribal Council.  The Court considers each argument in turn.

### Jurisdictional issues

As a threshold matter, this Court considers the jurisdictional issues raised by Defendants.  As a court of limited jurisdiction, this Court must consider whether jurisdiction exists pursuant to Article III of the United States Constitution, and dismiss an action if jurisdiction is lacking. *Southern Pacific Transportation Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990), *cert. denied*, 112 S. Ct. 382 (1991).

### *Standing*

This Court's Article III jurisdiction over a case "depends on the existence of a 'case or controversy.'" *GTE California, Inc. v Federal Communications Commission*, 39 F.3d 940, 945 (9th Cir. 1994).  "To enforce Article III's limitation of federal jurisdiction to 'cases and controversies, Plaintiffs must demonstrate...standing...." *Nelson v. National Aeronautics and Space Admin.*, 530 F. 3d 865, 873 (9th Cir. 2008).  To satisfy the Constitution's standing requirement, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant;

12

and (3) it is likely, as opposed to merely speculative, that there injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *Nelson v. NASA*, 530 F.3d 865, 873 (9th Cir. 2008).

As the parties seeking to invoke federal jurisdiction, Plaintiffs bear the burden of demonstrating that they have standing in this action. *Lujan*, 504 U.S. at 561. Plaintiffs must demonstrate standing "for each claim [they] seek[] to press" and for "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Laidlaw*, 528 U.S. at 185). "The plaintiff bears the burden of proof to establish standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561). In addition to these Article III standing requirements, a federal court's exercise of jurisdiction is limited to prudential considerations. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

Defendants point out that Plaintiffs' causes of action are premised on their claimed membership in the Tribe. Defendants reason that if Plaintiffs are not members of the Tribe, they will not have suffered an 'injury in fact" from Defendants' alleged violations of tribal law. Defendants then seek to establish that Plaintiffs are not members of the Tribe and, therefore, are without standing to assert their causes of action against Defendants. Pursuant to Article III, section 1 of the Tribe's Constitution, tribal membership is restricted to those who are: (1) listed on the genealogy roll of March 1978; (2) lineal descendants of those on the March 1978 genealogy roll and who possess a requisite degree of Indian and Timbisha Shoshone blood; or (3) persons of Indian blood who are adopted by the Tribe. In November 2008, the Death Valley Enrollment Committee determined that Plaintiffs, among others, do not qualify for membership in the Tribe. According to the Enrollment Committee, certain people were enrolled and included on the March 1978 genealogy roll in error because those people "never lived in the Timbisha Community in Death Valley; rather, they lived about 90 miles away in Darwin, California, or in other areas even farther away from Death Valley and were never part of the Timbisha Community." Goad Decl., ¶15. Noting that Defendants have acted to disenroll Plaintiffs, Defendants conclude:

> Because Plaintiffs are not tribal members, they have not suffered from Defendants' alleged violations of tribal law. It necessarily follows that Plaintiffs cannot satisfy the traceability and redressability requirements for standing, either. Accordingly,

Plaintiffs lack standing to bring their case, and the Court must dismiss it for lack of jurisdiction.

Def. Opp., 17.

Plaintiffs counter that the purported disenrollment of 73 Tribe members was illegal and illegitimate. Plaintiffs contend that Defendants "took advantage of this legal void and have conspired to purportedly disenroll Plaintiffs, and other tribal members viewed as Plaintiffs' supporters, from the Tribe, in an effort to politically silence those who have challenged Defendants' authority to govern the Tribe." Pl. Memo, 10. In addition, Plaintiffs charge that the purported disenrollments were undertaken without due process, in violation of tribal law, and without respect for tribal members' civil rights. *Id*.

Defendants respond that the Election Committee is required by Article III, Section 6 of Tribe's Constitution to revoke membership status from any individual who was enrolled in the Tribe erroneously, fraudulently, or incorrectly. Defendants contend that the Death Valley Election Committee afforded Plaintiffs and others due process by offering a hearing and a chance to offer evidence that they are lineal descendants of the March 1978 base roll. Further, Defendants claim that the disenrollments were not politically motivated. To support this position, Defendants note that the Enrollment Committee is independent from the Tribal Council, "many of those who were removed from the rolls had nothing to do with the factions that are attacking the Tribal Council, and some of those who oppose the Council appear on the March 1978 Base Roll and have not been disenrolled." Def. Opp., 17.

In their reply, Plaintiffs assert that they have standing in this action "both as tribal members and tribal officials recognized by the BIA for the purposes of the Tribe's intergovernmental relationship with the Tribe." Plaintiffs claim that they have suffered injury-in-fact, because Defendants, by forming an illegal Tribal Council, are denying Plaintiffs their right to participate in the Tribe's governance. Plaintiffs claim that this harm can be redressed by the issuance of a preliminary injunction to require Defendants to abide by tribal law and extant BIA decisions pending the outcome of administrative proceedings and any subsequent appeal.

Clearly, the parties dispute Plaintiffs' purported disenrollment by Defendants. It is unclear, however, whether this Court has the authority to resolve disputes rooted in tribal law. Plaintiffs contend that this Court need not interfere in the intratribal dispute to make a decision in this case. To determine

14

whether Plaintiffs have standing, however, the Court must interject itself into the internal affairs of the Tribe.  As an initial matter, the Court must determine the legitimacy of the disenrollment.  To resolve this issue, the Court must consider the numerous elections held by the parties to determine whether the 2008 Death Valley Tribal Council acted with legitimate authority when it accepted the recommendation of the Enrollment Committee to disenroll Plaintiffs from the Tribe.  In addition, the Court would be required to consider tribal law as it relates to elections and enrollment in the Tribe.  Moreover, this analysis raises evidentiary issues as to whether Defendants afforded Plaintiffs due process and whether Plaintiffs qualify under tribal law as tribe members.

Internal matters of a tribe are generally reserved for resolution by the tribe itself, through a policy of Indian self-determination and self-government as mandated by the Indian Civil Rights Act, 25 U.S.C. §§1301-1341.  Unless surrendered by the tribe, or abrogated by Congress, tribes possess an inherent and exclusive power over matters of internal tribal governance. *See Nero v. Cherokee Nation*, 892 F.2d 1457, 1463 (10th Cir. 1989).  Moreover, a "tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community. *Id*. (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n. 32 (1978)).  Based on these principles, and although the BIA has attempted through multiple decisions to define the Tribal Council for government-to-government purposes, the BIA will not interfere in the disenrollment issue.  In a May 5, 2008 letter in response to Plaintiffs' dispute of the disenrollment, the BIA wrote:

> The BIA adheres to a policy of Indian self-determination and self-government as mandated by the Indian Civil Rights Act, 25 U.S.C. §§1301-1341.  The BIA carries out a government-to-government relationship with the Timbisha Shoshone Tribe that includes the administration of trust and federally appropriated funds for which we are held accountable.  It has long been the policy of the Department of the Interior and the BIA, in promoting self-determination, not become involved in the internal affairs of tribal governments.

RJN, Ex. 20.  Similarly, without authority, this Court will not interfere in the internal affairs of the Tribe. *See, Milam v. U.S. Dep't of Int.*, 10 Indian L. Rep. 3013, 3015 (D. D.C. 1982) (ordinarily, disputes "involving intratribal controversies based on rights allegedly assured by tribal law are not properly the concerns of the federal courts.").

Neither party points to a provision of the Tribe's  Constitution, a Congressional Act, or other controlling authority to allow this Court to resolve the issue of disenrollment.  As set forth above,

resolution of the disenrollment issue turns on the parties' election dispute.  These issues are central to Indian self-determination and self-government.  Because this Court cannot determine the issue of standing without resolution of the legitimacy of disenrollment, Plaintiffs have failed to sustain their burden to demonstrate that they have standing to pursue this action.  Additionally, and for these reasons, Plaintiffs fail to make a "clear showing" that they are "likely to succeed" on the merits of this action.

*Sovereign immunity*

Defendants argue that Plaintiffs' suit is barred because they, as members of the 2008 Tribal Council, enjoy sovereign immunity.  "Sovereign immunity limits a federal court's subject matter jurisdiction over actions brought against a sovereign.  Similarly, tribal immunity precludes subject matter jurisdiction in an action against an Indian tribe." *Alvarado v. Table Mtn. Rancheria*, 509 F.3d 1008, 1015-16 (9th Cir. 2007).  Sovereign immunity "recognizes the sovereign of Indian tribes and seeks to preserve their autonomy [and] protects tribes from suits in federal and state courts." *Nero*, 829 F.2d at 1459.  Tribal sovereign immunity also "extends to tribal officials when acting in their official capacity and within the scope of their authority." *Cook v. Avi Casino*, 548 F.3d 718, 727 (9th Cir. 2008).

Plaintiffs respond to the Defendants' claim of sovereign immunity in three ways.  First, Plaintiffs contend that Pauline Esteves, Mr. Mason, and Ms. Boland do not enjoy sovereign immunity, because they were not elected members of the Tribal Council validly under tribal law, and are not recognized as tribal officials by the BIA.  Second, Plaintiffs claim that as the "governing majority of the 2006 Council," they waive sovereign immunity for minority members Mr. Kennedy and Ms. Esteves.  Third, Plaintiffs argue that Defendants have acted outside of the scope of their official authority by forming an illegal government and preventing Plaintiffs from participating as they are legally entitled to do.

This Court cannot determine, based on the evidence and the limitations of involvement in the Tribe's internal affairs, whether sovereign immunity extends to Pauline Esteves, Mr. Mason and Ms. Boland.  To prevail on this issue, Plaintiffs must establish, and ask this Court to determine, that Pauline Esteves, Mr. Mason, and Ms. Boland were elected to the 2008 Death Valley Tribal Council in violation of tribal law.  Plaintiffs fail to establish, in the first instance, whether this Court has the authority to make such a determination.  Because the Court cannot determine this issue, Plaintiffs have failed to make a "clear showing" that they are likely to succeed on this claim.

1   Similarly, this Court cannot determine whether Defendants are acting outside of their official

2   authority.  While tribal officials who act beyond the scope of their authority may not be protected by

3   sovereign immunity, Plaintiffs fail to establish that this Court has the authority to determine which

4   faction is the current, legitimate governing body of the Tribe.

5   For these reasons, Plaintiffs' assertion that they have waived Mr. Kennedy's and Ms. Esteves'

6   sovereign immunity fails.  Sovereign immunity may be waived by tribal consent; however, "it is settled

7   that a wavier of sovereign immunity cannot be implied but must be unequivocally expressed." *Santa*

8   *Clara Pueblo*, 436 U.S. at 58.  Here, Plaintiffs argue that they, as the majority of the 2006 Council,

9   impliedly waived the sovereign immunity of Mr. Kennedy and Ms. Esteves by initiating this action

10   against them.  Implied waived of tribal sovereign immunity is not an unequivocal expression of waiver

11   by tribal consent.  Accordingly, Plaintiffs's opposition to Defendants' sovereign immunity claim fails

12   on these grounds.

13   Plaintiffs claim that the issue of sovereign immunity is irrelevant to the determination of whether

14   Plaintiffs should be recognized by the BIA as members of the Tribal Council for government-to-

15   government purposes.  Plaintiffs submit that this Court may disregard Defendants' claim of sovereign

16   immunity and issue an interim injunction.  However, a BIA determination of a Tribal Council for

17   government-to-government purposes is within the province of the BIA.  Currently, two consolidated

18   appeals are pending before the IBIA on this issue.  In addition, Plaintiffs do not seek to have this Court

19   determine a Tribal Council for government-to-government purposes.  Instead, Plaintiffs ask this Court

20   to interject itself into the internal affairs of the Tribe by making a determination on tribal elections and

21   enrollment.  Thus, the issues raised by the parties concern internal affairs, not the affairs between the

22   Tribe and the government.

23   Because Defendants raise serious jurisdictional issues in this action which may bar Plaintiffs'

24   suit, Plaintiffs have failed to make a "clear showing" that they are likely to succeed in this action.[5]

25   _____

26   [5]The Court further questions whether Plaintiffs' claims may also be rendered moot.  Plaintiffs must also demonstrate
    that its claims are not moot.  *Friends of the Earth, Inc. v. Laidlaw,* 528 U.S.167, 189 (2000).  As set forth above, the Tribe

27   hold elections each year in November.  A new election may have taken place, to render this action moot.  In addition, the
    pending appeals before the IBIA will also affect this Court's subject matter jurisdiction.  Accordingly, Plaintiffs' action faces

28   multiple jurisdictional challenges.  Plaintiffs failure to address these challenges requires this Court to find that Plaintiffs are

1

**BIA's record of decisions**

2          In addition to jurisdictional challenges, Defendants point out that the BIA decisions upon which

3   Plaintiffs rely are dubious, at best.  On this point, the parties agree.  Plaintiffs' well-supported

4   memorandum of points and authorities explains the confusing positions of the BIA:

5               The BIA has been complicit in permitting Defendant [sic] to operate unilaterally,
              notwithstanding their continued representations to Plaintiffs that they recognize the 2006
6               Council, and in spite of 2006 Council resolutions outlawing Defendants' actions.
              [citations]  In addition, it is notable that *the BIA has stated that they will no longer*
7               *communicate with Plaintiffs regarding Tribal operations, notwithstanding the fact that*
              *they have indicated that they recognize the 2006 Council*, of which, Plaintiffs constitute
8               the majority. [citations].  Specifically, the *BIA has not responded to Plaintiffs' requests*
              *to change the name of the Tribe's representative* on the Central Contractor Registration
9               from that of Defendant Kennedy to those designated by the majority of the 2006 Council.
              [citations].     Instead,     *the  BIA  continues  to  accept  Defendant  Kennedy's*
10              *misrepresentations that he is the sole authority to decide how the Tribe's money is spent*.
              [citation].  Because the BIA does not abide by its decision to recognize the 2006 Council,
11              other public entities such as the California Gambling Control Commission, which [sic]
              has continued to forward RSTF funding to Defendant Kennedy, in spite of the 2006
12              Council's request to direct all funding pursuant to its designation. [citations].   In
              addition, Mr. Casey has attempted on numerous occasions to contact BIA officials to
13              address the irreparable harm being suffered by Plaintiffs and tribal members as a result
              of Defendants' actions, only to be put-off and *told that those concerns could not be*
14              *addressed, while being simultaneously advised that the 2006 Council is recognized by*
              *the BIA*.  ¶  Defendants have taken advantage of this *legal void*....

15

16   Pl. Memo, 9-10 (emphasis added).  By Plaintiffs' evidence, this Court finds that it is unable to rely on

17   the BIA's conflicting decisions to determine that Plaintiffs are the legitimate governing authority of the

18   Tribe.  Plaintiffs' reliance on the BIA decisions is problematic, considering the inconsistent BIA

19   decisions, the BIA's decision to stop communication with Plaintiffs regarding tribal operations, and the

20   BIA's position that it cannot involve itself in the internal affairs of the Tribe.  Based on the history of

21   the BIA's equivocal decisions, and considering the upcoming tribal elections, Defendants correctly

22   concludes that neither side can predict with certainty how the IBIA will resolve the pending appeals.

23   Accordingly, Plaintiffs have failed to make a "clear showing" that they are likely to succeed on the

24   merits of their case, which rely necessarily on the wavering BIA decisions.

25                                              **Tribal Law**

26          Plaintiffs contend that tribal law demonstrates that they are likely to prevail on their claims,

27   ───────────────────

28   unlikely to succeed on the merits of this claims.

because Defendants actions from the August 25, 2007 Tribal Council meeting through the present have been unconstitutional. The BIA has considered the actions of the Defendants in its multiple decisions. Based on that record, and the Court's own review, the Court finds that some of Defendants 2007-2008 election actions violated the Tribe's Constitution.

Nevertheless, this Court cannot determine that Defendants, as the 2008 Death Valley Tribal Council, are without legitimate governing authority based on the Tribe's Constitution. Defendants point out that under Article VI, section 3 of the Tribe's Constitution, Tribal Council members serve staggered two-year terms. Thus, pursuant to tribal law and when the 2006 Council members were elected, the terms of Mr. Beaman and Ms. Esteves ended in November 2007 and the terms of Mr. Kennedy, Ms. Beck, and Mr. Casey ended near the end of 2008. Accordingly, it is questionable whether Plaintiffs qualify as the "government majority" of the Tribal Council under tribal law, as their terms have expired.[6]

**Merits of Plaintiffs' Claims**

In their memorandum of points and authorities, Plaintiffs ignore the relevant inquiry–whether they are likely to prevail on the ten causes of action they assert against Defendants. Defendants contend, in their opposition, that Plaintiffs are unlikely to succeed on their causes of action for multiple reasons. Defendants argue that Plaintiffs will "struggle" to demonstrate that they were damaged by Defendants' expenditures of federal funds through their control of the bank accounts, because Defendants administration has benefitted the Tribe. Plaintiffs wholly ignored Defendants' arguments in their reply. Because Defendants' unopposed arguments that Plaintiffs are unlikely to succeed on their causes of action appear to be meritorious, Plaintiffs have failed to show that they are likely to succeed on the merits of their claims.

**<u>Irreparable Injury Absent an Injunction</u>**

Next, the Court considers whether Plaintiffs will suffer irreparable injury absent an injunction. "Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting *Winter*, 129 S.Ct. At 375) (noting that the Supreme Court in *Winter* rejected the Ninth Circuit's

---

[6]This issue also supports Defendants' standing argument.

1   "possibility of irreparable harm" test).  Both parties establish that the current dispute been Plaintiffs and

2   Defendants has caused, and continues to cause, injury to the Tribe, tribal members, and third parties.

3   Plaintiffs' reply summarizes well that Plaintiffs' *and* Defendants' evidence establishes harm.  Thus, it

4   is undisputed that the parties are causing each other harm, some of which is irreparable.

5         Plaintiffs' declarations support its position that Defendants' actions have caused the following

6   harms, among others: (1) denial of access to the Tribe's programs and services through disenrollment;

7   (2) tribal members living in unsafe and unhealthy living conditions through disenrollment; (3) removal

8   and attempted removal of tribal members and/or former tribal members from their housing because of

9   disenrollment; (4) denial of tribal members and/or former tribal members' livelihoods, including

10  financial, educational, and employment opportunities; (5) destruction of tribal heritage; (6) Tribe's loss

11  of good will in the business community, and with federal and state agencies; and (7) degradation of the

12  Tribe's ability to participate in official proceedings before state and federal agencies.[7]

13        Some of the harm Plaintiffs claim is irreparable.  "Typically, monetary harm does not constitute

14  irreparable harm."  *Cal Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009).

15  "Economic damages are not traditionally considered irreparable because the injury *can later be remedied*

16  *by a damage award*."  *Id*. at 852 (emphasis in original).  However, "intangible injuries, such as damage

17  to...goodwill qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental,*

18  *Inc*., 944 F.2d 597, 603 (9th Cir. 1001).

19        The Court notes that the majority of Plaintiffs' harms are based on the disputed disenrollment.

20  As discussed more fully above, Plaintiffs have failed to establish that this Court has the authority to

21  determine the legitimacy of the disenrollment.  Thus, although Plaintiffs are suffering harm, they have

22  not established that the harm is based on an action that is redressable in a federal action.

23                    **Harm to Defendants**/ **Balance of Equities**

24        Defendants contend that this Court should not reward the actions of Plaintiffs, which have

25  starved the Tribe of funds through the continual harassment of freezing its funds.  Defendants' evidence

26  _____

27        [7]Plaintiffs further argue that defendants caused irreparable harm by denying plaintiffs their civil rights through
    disenrollment without compliance with Tribal laws and procedures and through enforcing an unconstitutional removal of

28  office.  These intra-tribal issues are disputed.

establishes that Plaintiffs' actions have caused the following harms, among others: (1) denial of access

to the Tribe's program's and services through disruption of funding; (2) tribal members living in unsafe

and unhealthy conditions through disruption of funding; (3) denial of housing to tribal members; (4)

destruction of tribal heritage; and (5) interference with tribal environmental programs and confusion

caused to state and federal agencies regarding the leadership of the Tribe.[8]  Considering the harms to

both Plaintiffs and Defendants, and the nature of the relief sought by Plaintiffs, this Court finds that the

balance of equities tips in favor of Defendants.

Plaintiffs argue that the purpose of a a preliminary injunction is to preserve the status quo if the

balance of equities so heavily favors the moving party that justice requires the court to intervene to

secure the positions until the merits of the action are ultimately determined.  *University of Texas v.

Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830 (1981).  According to Plaintiffs, "status quo" means the

last uncontested status that preceded the pending controversy. *See, GoTo.com, Inc. v. Walt Disney Co.*,

202 F.3d 1199, 1210 (9th Cir. 2000).  However, as set forth in *Marlyn Nutraceuticals, Inc. v. Mucos

Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009), a "preliminary injunction can take two

forms:"

> A prohibitory injunction prohibits a party from taking action and "pre-serve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333, 104 S. Ct. 10, 77 L. Ed. 2d 1431 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction "orders a responsible party to 'take action.'" *Meghrig v. KFC Western.*, 516 U.S. 479, 484, 116 S. Ct. 1251, 134 L. Ed. 2d 121 (1996). A mandatory injunction "'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

Although Plaintiffs maintain that the status quo is the 2006 Tribal Council, the evidence

establishes that the status of the parties prior to this action is that Plaintiffs and Defendants are running

parallel tribal governments.  For over two years, the Bishop and Death Valley factions have held e and

created new Tribal Councils.  Each new Tribal Council has acted with purported authority.  The evidence

further shows that each faction refuses to recognize the authority and edicts of the other.  Considering

---

[8]Defendants also present evidence that Plaintiffs violated civil rights by an unconstitutional removal of office. Because

that the parties are acting in parallel, the remedy Plaintiffs seek goes beyond the status quo pending

litigation.  Plaintiffs seek to require the 2008 Death Valley Tribal Council to take affirmative steps to

relinquish the governing authority they believe they rightfully have, to relinquish power over the bank

accounts they currently control, to allow Plaintiffs to overturn actions they took as the Tribal Council,

and to govern a group of people in Death Valley without having been elected to do so.  Because

Plaintiff's seek a preliminary injunction that goes beyond preservation of the status quo, Plaintiffs seek

a mandatory injunction.  In general, mandatory injunctions "are not granted unless extreme or very

serious damage will result and are not issued in doubtful cases or where the injury complained of is

capable of compensation in damages." *Anderson*, 612 F.2d  at 1115.  Because this is a doubtful case, as

set forth above, considering the harms to each party, this factor tips in favor of Defendants and against

the issuance of a preliminary injunction.

### Public Interest

As a final factor, the Court considers the public interest.  "In exercising their sound discretion,

courts of equity should pay particular regard for the public consequences in employing the extraordinary

remedy of injunction." *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S.

305, 312 (1982)).  "The public interest analysis for the issuance of a preliminary injunction requires [the

Court] to consider whether there exists come critical public interest that would be injured by the grant

of preliminary relief." *Indep. Living*, 572 F.3d at 659.

Here, the Court finds that the public interest factor is neutral.  The Tribe and its members would

be benefit by an end to the dispute between the factions.  A preliminary injunction to end this dispute

would favor the public interest.  However, the public also benefits from this Court's restraint.  Because

self-determination and self- governance of tribes are important to the public interest, the Court's refusal

to meddle in the internal affairs of the Tribe mandates that no injunction issue.  Based on these

competing interests, this factor is neutral.

### Conclusion

As set forth above, Plaintiffs have failed to make a "clear showing" that they are likely to succeed

on the merits of their claims. Defendants have raised multiple jurisdictional challenges that may bar

Plaintiffs' action.  Moreover, Plaintiffs wholly ignore Defendants' challenges to the merits of their

22

causes of action.  Although Plaintiffs establish that they are suffering harm, this Court is uncertain that Plaintiffs have standing to redress their harm through this action without interjecting itself into the internal affairs of the Tribe.  In addition, Defendants have also established that they are suffering harm as a result of Defendants actions.  Plaintiffs seek a preliminary injunction that go beyond preserving the status quo to require Defendants to relinquish governing authority of the Tribe, something they believe they rightfully hold.  Based on the uncertainty of the BIA decisions, the Tribe's right to self-determination and self-governments, and Plaintiffs' failure to address the merits of their claims, this Court denies Plaintiffs' motion for a preliminary injunction.

### ORDER

For the foregoing reasons, this Court DENIES Plaintiffs' motion for a preliminary injunction. IT IS SO ORDERED.

**Dated:   November 3, 2009**          /s/ Lawrence J. O'Neill
                                        UNITED STATES DISTRICT JUDGE